## AFFIDAVIT

I, Lisa Rudnicki, having been duly sworn, on oath depose and state that:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and have been so employed since February, 1996. In that capacity, I investigate violations of the federal firearms statutes and have participated in numerous investigations relating to the unlawful possession of firearms and ammunition.

2. Based on my training and experience, I am aware that Title 18, United States Code, Section 922(g)(1) makes it a federal offense for any individual who has previously been convicted of a crime punishable by imprisonment for a term exceeding one year to possess a firearm or ammunition in or affecting interstate commerce. Having so stated, I make this affidavit in support of a complaint charging an individual named **ANTHONY WALLACE** with being a felon-in-possession of a firearm and ammunition in violation of that statute.

3. The statements contained in this affidavit are based on my own investigation and on information provided to me by officers of the Boston Police Department. This affidavit is submitted for the limited purpose of establishing probable cause

to believe **WALLACE** violated 18 U.S.C. §922(g)(1). It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

4. The investigation into **ANTHONY WALLACE**'s firearm possession was initiated at approximately 4:25 p.m. on May 10, 2011 when a 911 call was received by the Boston Police Department regarding a man with a gun at the basketball courts at the Mary Ellen McCormack Housing Development in South Boston. The caller reported that there was a "kid" in a red hat and a red hoody "on the wall" with a handgun underneath his red jacket. The caller explained that the "kid" was at the basketball court where the tennis courts are in the Mary Ellen McCormack Housing Development and was sitting on the wall. The caller also stated that the kid with the gun was black, wearing dungarees, and had a black gun that he had pulled out, causing others in the area to run.[1]

---

[1] This call followed an earlier 911 call for a man with a gun in the area of "Mory Park" in Andrew Square. The description of the man given in this earlier call was similar (red hat, red hoody, black gun) and that caller said the man with the gun had tattoos on his face. Officers responded to Andrew Square area but did not locate anyone with a gun.

-2-

5. The information obtained from that caller was immediately put out over the Boston Police Department radio. The dispatch advised that there was a man with a gun at the basketball court that matched the description (black male, red hat, red hoody) previously given.

6. Two of the officers who heard these dispatches and responded to the Mary Ellen McCormack Housing Development were Boston Police Officers Nee and Sullivan. After hearing the dispatch regarding the man with the gun at the Mary Ellen McCormack basketball courts, Officers Nee and Sullivan proceeded up Dorchester Avenue and took a right turn on General Devine Way which is immediately adjacent to the basketball court described by the second 911 caller and referenced in the dispatch.

7. As Officers Nee and Sullivan pulled into General Devine Way (going the wrong way down a one-way street), they had a clear view of the seating and wall adjacent to the basketball court referenced in the 911 call and immediately saw a man who matched the description given. As soon as that man (later determined to be **WALLACE**) saw the unit pull in, he turned and ran in the opposite direction towards O'Callaghan Way.

-3-

8. Nee and Sullivan pursued **WALLACE** as **WALLACE** ran through a courtyard in the Mary Ellen McCormack Housing Development towards O'Callaghan Way. As they did so, they noted that **WALLACE** had a bottle in his left hand and kept his right arm pinned to his side as if he was attempting to secure a weapon or some other object.

9. As **WALLACE** got closer to O'Callaghan Way (with Nee and Wallace in pursuit), Nee and Wallace saw a marked cruiser going up O'Callghan Way past the location where **WALLACE** would be coming out on that street. They radioed for the driver of that unit (Officer Murphy Gregory) to stop and advised him that the suspect was headed his way.

10. Officer Gregory immediately stopped his unit not far from the intersection of O'Callghan Way and Logan Way and got out. As he did so, he watched **WALLACE** run out onto O'Callaghan Way with a bottle of beer in his left hand and his right hand in his pocket. **WALLACE** got to the sidewalk on O'Callaghan Way, turned to the right (apparently not noticing Gregory) and began to move down O'Callaghan Way.

11. Gregory immediately ordered **WALLACE** to stop and take his hand out of his pocket. **WALLACE** continued to move down

-4-

O'Connor Way, telling Gregory that "he didn't have a gun and didn't know what "you guys want."

12. Gregory continued to chase **WALLACE** down O'Callaghan Way and, as he closed the distance, repeatedly told **WALLACE** to stop and to take his hand out of his pocket. **WALLACE** ignored those commands.

13. Ultimately, Gregory caught **WALLACE** in front of 251 O'Callaghan Way. **WALLACE** removed the gun from his hoody and pointed it directly at Officer Gregory. Officer Gregory, who had also drawn his weapon, demanded that **WALLACE** drop his gun. **WALLACE** refused to do so and kept his drawn weapon pointed in the direction of Officer Gregory.

14. As **WALLACE** and Officer Gregory were in the standoff around a large tree in front of 251 O'CALLAGHAN Way, Officers Nee and Sullivan caught up and approached. In response, **WALLACE** began to move the gun in the direction of these officers but then, having seen that two more officers were now on the scene, dropped his gun to the ground and was immediately taken into custody.

15. The firearm discarded by **WALLACE** in front of the officers is a Firearms International Corporation Model Regent .22

-5-

caliber revolver bearing serial number R38589.  The firearm, which had the hammer cocked back when recovered, contained 5 rounds of .22 caliber ammunition and 2 .22 caliber spent shell casings.

16.   After the suspect firearm and ammunition were recovered from **WALLACE**, they were inspected by ATF S/A Mattheu Kelsch, who is trained to perform interstate commerce nexus examinations. S/A Kelch examined the firearm and the ammunition recovered from **WALLACE**, determined that they were a "firearm" and "ammunition" for purposes of federal law, and determined that they were each manufactured outside Massachusetts, meaning that they had traveled across state lines or international boundaries prior to being seized in South Boston on May 10, 2011.

17.   I have reviewed **WALLACE**'s criminal record as maintained by the Massachusetts Criminal History Systems Board.  It reveals, among other things, that **WALLACE** was convicted in Roxbury District Court in 2008 of Possessing a Class B Substance With Intent to Distribute.  Based on my training and experience, I know this crime is punishable by a term of imprisonment exceeding one year under Massachusetts law.

18. Based on the foregoing, I submit that there is probable cause to believe that, on or about May 10, 2011, **ANTHONY WALLACE,** having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did posses, in and affecting commerce, a firearm and ammunition in violation of Title 18, United States Code, Section 922 (g)(1).

*Lisa A. Rudnicki*
LISA RUDNICKI
SPECIAL AGENT, ATF

Sworn and subscribed to before me this 30 day of June, 2011.

*Marianne B. Bowler, USMJ*
MARIANNNE B. BOWLER
U.S. MAGISTRATE JUDGE

-7-